UNITED STATES of America, Appellee,

v.

Priscilla Ann SULLIVAN, Appellant.

UNITED STATES of America, Appellee,

v.

Dan E. SULLIVAN, Appellant.

UNITED STATES of America, Appellee,

v.

Ralph D. HARRELL, Appellant.

UNITED STATES of America, Appellee,

v.

Carl DUVALL, Appellant.

Nos. 79–1597 to 79–1600.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1980.

Decided April 16, 1980.

Rehearing and Rehearing En Banc
Denied May 7, 1980.

Robert G. Duncan, Duncan, Russell & Reardon, Gladstone, Mo. (argued), J. D. Williamson, and Robert E. Hart, Independence, Mo., on brief, for appellant.

Ronald S. Reed, Jr., U. S. Atty., Kansas City, Mo. (argued), Cynthia A. Clark, Asst. U. S. Atty., Kansas City, Mo., on brief, for appellee.

Before ROSS and HENLEY, Circuit Judges, and PORTER, District Judge.*

HENLEY, Circuit Judge.

In 1979 the defendants, Dan E. Sullivan, his wife, Priscilla Ann Sullivan, Ralph D. Harrell and Carl Duvall, were found guilty by a jury in the United States District Court for the Western District of Missouri (District Judge Russell G. Clark) of embezzlement of labor union funds and related offenses in violation of the criminal provisions of the Landrum-Griffin Labor-Management Reporting and Disclosure Procedure Act of 1959, 29 U.S.C. § 401 *et seq.*, and of various provisions of Title 18, U.S.C.

The indictment contained twenty counts. Not all of the defendants were named as defendants in all of the counts. Each defendant was found guilty and sentenced on the counts in which he or she had been charged. Sentences were imposed, and all four defendants appealed. The appeals were consolidated. While the appeals were pending, the defendant Harrell died; his death mooted his appeal and abated the original prosecution as to him.

The labor union involved in the case is Hoisting and Portable Engineers, Local 101, International Union of Operating Engineers, AFL–CIO. "Operating engineers" are individuals who are engaged in the trade or craft of operating heavy excavating and hoisting machinery. They are employed primarily by contractors engaged in the construction industry.

Local 101 during 1977 and prior years was a large labor union having about 4,000 members and with jurisdiction over the western part of the State of Missouri and all of the State of Kansas. Specifically, its jurisdiction included the Kansas City, Missouri metropolitan area which embraces certain counties in western Missouri and eastern Kansas.

For convenience, we will refer to the local labor union involved in the case as "Local 101," or as the "local union," or simply as the "union." The International Union will be referred to as such.

For many years the defendant, Dan E. Sullivan, was the president and business manager of Local 101. As president Sullivan received no compensation, but he was well paid for his services as business manager. Prior to the commencement of the indictment period Sullivan married Priscilla Ann Chaney and gave her the job of office manager of the local union for which she was compensated.

During the period with which we are concerned, Local 101 had officers in addition to the president, including the financial secretary, Sam Long, and the union treasurer, Floyd Bledsoe. They were not only officers of the local union but also were employed, along with others, as business agents. As business agents they were paid for their services.

Sullivan had the authority to hire and fire employees of the local union, including business agents.

The criminal litigation which is involved here had its genesis in April, 1977 when Local 101 struck a number of construction firms in the Kansas City area and mounted pickets. The strike, while prolonged, did not involve all union members and did not affect all of the territory within the jurisdiction of Local 101.

For one reason or another the local union found it necessary to pay members for doing picket duty, and while some payments were made out of general union funds, most of them were made from a "Picket Carriers Relief Fund" that was financed by contributions from members of the union who were not on strike and by some very substantial contributions from the International Union.

As we understand it, the Relief Fund was separate and distinct from the general funds of the union, and checks drawn on the Relief Fund had to bear two signatures. Mrs. Sullivan seems to have had no access

---

* The Honorable Donald J. Porter, United States District Judge, District of South Dakota, sitting by designation.

to that fund, and the case involves no misapplication of Relief Fund moneys.

The general funds of the union were deposited in two Kansas City banks, the Westport Bank and the Traders National Bank.

As stated, Floyd Bledsoe was for a time treasurer of Local 101. He served as treasurer during 1977 and up until he was removed from office and employment by Dan E. Sullivan in February, 1978. Mr. Bledsoe seems to have had some serious health problems and because of those problems and for other reasons he engaged in the negligent practice of signing in blank checks that, when completed, would be drawn on the local union's account with the Westport Bank. Mrs. Sullivan, referred to generally in the evidence as "Ann," had full access to those checks.

As office manager of Local 101 Mrs. Sullivan conducted business at both of the banks that have been mentioned. At the Westport Bank she dealt primarily with a teller, Jacquelyn Donahue, who later married Sam Long to whom we have referred. It may be noted that in years prior to 1977 both Sam Long and Floyd Bledsoe had been opposed to Dan Sullivan in the area of union politics but had not been successful. In the course of time both Long and Bledsoe made peace with Sullivan and were elected to union office and given union employment.

Local 101's strike began about the first of April, 1977. During a period between about April 26, 1977 and November 16, 1977 Mrs. Sullivan filled out in favor of the union "petty cash" checks that Bledsoe had signed in blank. She then forged Bledsoe's endorsement on the checks and negotiated them with Jacquelyn Donahue (as she then was) at the Westport Bank, received the proceeds of the checks in currency and departed with them. Later, Mrs. Sullivan changed the endorsements on the checks to the extent that she caused them to show that the signature of Bledsoe had been "By Ann Sullivan."

Those petty cash checks were written periodically about every week to two weeks and generally were in amounts of either $3,000.00 or $4,000.00. There was evidence that during the check writing period Mrs. Sullivan bought an expensive automobile and expensive furs, and that on one occasion she bought forty pairs of shoes.

The basic theory of the government in the case was that the proceeds of those checks were converted by Mr. and Mrs. Sullivan to their own use. The total amount of the checks was well in excess of $60,000.00. While some of the money was restored to the union, a Labor Department audit was to show a final shortage of nearly $50,000.00.

In late November or early December of 1977 certain union officers and employees, principally Long and Bledsoe, became concerned about the very large withdrawals of union funds for the alleged benefit of petty cash. Long, Bledsoe and others called on Sullivan for an accounting and also demanded the discharge of Mrs. Sullivan from union employment.

While Sullivan was conciliatory at first, he later became defiant. The difference between Sullivan and his adherents, and those who supported the Long-Bledsoe position led to violence at one or two union meetings. It also led to a request by the anti-Sullivan faction to the International Union to investigate local union affairs, and at some stage the Labor Department received information that the conduct of the affairs of Local 101 may have involved violations of the Landrum-Griffin Act.

In January, 1978 the Labor Department undertook an investigation of the affairs of Local 101 as authorized by 29 U.S.C. § 521, and in February, 1978 the International Union imposed a trusteeship on Local 101 which effectively removed Mr. and Mrs. Sullivan from control of local union affairs. Prior to that time, however, Mr. Sullivan had discharged Long, Bledsoe, and certain others from union employment.

The Labor Department investigation caused the Department to turn the matter over to the Department of Justice and the United States Attorney for the Western District of Missouri, and the indictment against the defendants was duly returned.

*I. Statutory Provisions.*

Before looking at the indictment, we will refer briefly to the federal statutes involved.

The statutes are the reporting, record-keeping, and anti-embezzlement provisions of the Landrum-Griffin Act, *supra*, and certain provisions of the general Criminal Code of the United States, Title 18 U.S.C.

The Landrum-Griffin Act covers employers and labor unions the activities of which affect interstate or foreign commerce. 29 U.S.C. § 402(a), (e), (i) and (j). No claim is made that Local 101 was not subject to the provisions of the Act in 1977 and 1978.

The Act, 29 U.S.C. § 431 *et seq.*, imposes certain recordkeeping requirements on labor unions and employers. A willful violation of those requirements is a serious misdemeanor punishable by a fine of not more than $10,000.00 or by imprisonment for not more than one year, or both. § 439(a). Somewhat more specifically, deliberate falsification of a record required to be kept is punishable by a fine of not more than $10,000.00 or imprisonment for not more than one year, or both. 29 U.S.C. § 439(c).

Embezzlement, to the embezzler's own use or to that of another, is a felony and is punishable by a fine or not more than $10,000.00 or by imprisonment for not more than five years, or both. 29 U.S.C. § 501(c).

29 U.S.C. § 521 authorizes the Secretary of Labor to conduct appropriate investigations in cases in which he has reason to believe that violations of the Act have taken place.

Turning to the Criminal Code, § 1505 of Title 18, U.S.C. makes it a felony for any person to undertake to impede, interfere with, or obstruct an administrative investigatory proceeding such as the Secretary of Labor undertook in this case as authorized by 29 U.S.C. § 521.

18 U.S.C. § 1001 makes it a felony for any person to submit a materially false statement in any matter within the jurisdiction of any department or agency of the United States.

Section 371 is the familiar conspiracy statute which prohibits the formation by any two or more persons of any conspiracy to violate a law of the United States or to defraud the United States, provided that at least one of the conspirators commits an overt act in furtherance of the conspiracy.

And, the indictment mentions 18 U.S.C. § 2 which is familiarly referred to as the "aiding and abetting" statute.

With reference to all of those statutes it may be said that a specific mens rea is required. That is, the person charged must have acted knowingly, willfully and with intent to disregard the law or to violate its requirements.

*II. The Indictment.*

Turning now to the indictment, Count One charged Mrs. Sullivan with the embezzlement of a little less than $50,000.00 of the funds of Local 101. Count Two charged Dan E. Sullivan with aiding and abetting his wife in the alleged embezzlement.

Counts Three through Eight charged Sullivan with embezzlements of union funds for the benefit of himself and others. All of those alleged embezzlements took place on February 21, 1978 immediately before the imposition of the trusteeship by the International Union. The beneficiaries of the alleged embezzlements, which were in varying amounts, were Mr. Sullivan, his wife, her co-worker in the office, Mary V. Hunter, Ralph D. Harrell, Richard Needham and Robert E. Williams.

Count Nine was an embezzlement charge against Ralph D. Harrell alone. Since he is dead, we need not refer further to that count.

Count Ten charged an embezzlement of $567.00 in union funds for the benefit of Ralph D. Harrell, his son, Forrest N. Harrell, Carl Duvall, Wilbur R. Hoff, Richard E. Needham, Joseph E. Robbins and Robert E. Williams.

Count Eleven charged the willful making by Sullivan of a false entry in a record required by the Landrum-Griffin Act to be kept, namely a journal that purported to

reflect strike expenses incurred by the local union.

Count Twelve charged a willful failure to keep required records.

Count Thirteen charged a conspiracy among all of the defendants, and others not indicted, to obstruct, impede and interfere with the Labor Department investigation that has been mentioned.

Counts Fourteen through Eighteen charged specific acts on the part of Sullivan to obstruct the Labor Department's investigation, including the representation to Thomas R. Wayne, the Compliance Officer of the Labor Department who was conducting the investigation, that the Strike Expense Journal mentioned in Count Eleven was true and correct.

Count Nineteen was directed at the deceased defendant Harrell, and is not relevant here.

Count Twenty charged the defendant Duvall with a single act of submission of a false statement or statements to the Labor Department in violation of 18 U.S.C. § 1001.

The jury trial of the case consumed several days. At appropriate times the defendants moved for the entry of judgments of acquittal, which motions were denied. Having been convicted the defendants received the following sentences:

1. Priscilla Ann Sullivan on Count One was fined $5,000.00. On Count Thirteen she was sentenced to imprisonment for three years subject to the discretionary parole provisions of 18 U.S.C. § 4205(b)(2).

2. Dan E. Sullivan was sentenced on Count Thirteen to a fine of $10,000.00 and to imprisonment for three years, subject to the provisions of § 4205(b)(2). On each of the other counts on which he had been convicted, Sullivan was fined $1,000.00.

3. Ralph D. Harrell received a sentence of one year on each of the counts on which he was convicted with the sentences to run concurrently.

4. Carl Duvall, who played a very minor part in the alleged overall operation, received two sixty-day jail sentences to be served concurrently.

From what has just been said, it is clear that Mr. and Mrs. Sullivan were the principal targets of the prosecution.

For reversal, the defendants contend collectively that the evidence was insufficient to sustain the verdicts, and that the trial court erred in excluding certain exhibits tendered by defense counsel. Dan E. Sullivan contends individually that Counts Eleven and Twelve of the indictment were mutually exclusive and contradictory, and that his conviction on both of those counts cannot stand.

*III. Sufficiency of the Evidence.*

In evaluating the sufficiency of the evidence to sustain the verdicts we view the evidence in the light most favorable to the government and give to the government the benefit of all inferences in its favor that reasonably may be drawn from the evidence. Questions as to the credibility of witnesses and as to the weight to be given to their testimony are for the jury and not for a reviewing court. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Berry*, 599 F.2d 267, 268 (8th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Scholle*, 553 F.2d 1109, 1118 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

A conviction in a criminal case may be based properly on circumstantial as well as on direct evidence. *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Wisdom*, 534 F.2d 1306, 1309 (8th Cir. 1976); *United States v. Diggs*, 527 F.2d 509, 512 (8th Cir. 1975). Willfulness, intent and guilty knowledge may be proved by circumstantial evidence and frequently cannot be proved in any other way. *United States v. Arnold*, 543 F.2d 1224, 1225 (8th Cir. 1976), *cert. denied*, 429 U.S. 1051, 97 S.Ct. 765, 50 L.Ed.2d 768 (1977); *United States v. Wisdom, supra; United States v. Diggs, supra.*

As to Mrs. Sullivan the important counts of the indictment were Count One and Count Thirteen. As to the relatively less important defendant Duvall, the important counts were Count Thirteen and Count Twenty.

With respect to Dan E. Sullivan, the most important count, as it turned out from his standpoint, was Count Thirteen, the conspiracy count, on which he was fined and sentenced to imprisonment for three years, although he was convicted and fined on the other counts of the indictment in which he was charged.

We call attention to the fact that the offenses charged in Counts Three through Twelve and Counts Fourteen through Twenty were allegedly committed during the life of the conspiracy charged in Count Thirteen, which conspiracy was alleged to have been formed in December, 1977.

■ When the evidence is considered in the light of the review standards that we have stated, we are satisfied that the jury was justified in finding, although it was not required to find, that during the spring, summer and fall of 1977 Mrs. Sullivan took advantage of the strike and of the availability to her of the checks that had been signed in blank by Mr. Bledsoe to embezzle union funds to the extent alleged in Count One.

We also think that the jury permissibly found that Mr. Sullivan aided and abetted his wife in her embezzlements. Indeed, it would be naive to think that Mrs. Sullivan would have embezzled union funds to the extent indicated without the full knowledge and connivance of her husband.

Thus, we think that the evidence was sufficient to sustain the convictions of Mrs. and Mr. Sullivan, respectively, on Count One and Count Two of the indictment.

■ We are also convinced that the evidence sustained the jury's finding with respect to Count Eleven that Sullivan maintained a Strike Expense Journal in which he knowingly and willfully made entries showing that union funds had been paid to various individuals for services on the strike picket lines, which entries were false and known to Sullivan to be false.

In our view the jury was justified in finding that by early December, 1977 Sullivan, his wife, and other members of his faction, were aware that the Labor Department might move under 29 U.S.C. § 521 to investigate the affairs of Local 101, and that they also knew that the International Union might place the local union under a trusteeship which would strip Sullivan of his control of local union affairs.

■ The jury was also justified in finding that during the period defined in Count Thirteen of the indictment the defendants and others conspired to impede, interfere with and obstruct the contemplated Labor Department investigation by written and oral representations to the Department representative conducting the investigation to the effect that various individuals had received substantial payments for picket line services that they had not performed and for which they had not in fact been paid. And the jury was justified in finding that it was a part of the conspiracy that Sullivan would turn over to the Labor Department representative the Strike Expense Journal mentioned in Count Eleven of the indictment.

Assuming that the jury was justified in finding the existence of the conspiracy charged in Count Thirteen, it was certainly justified in finding that one or more of the overt acts alleged in that count were committed in furtherance of the conspiracy.

Accordingly, we hold that the evidence was sufficient to sustain the convictions of Mr. and Mrs. Sullivan, the late Ralph D. Harrell, and Carl Duvall of the conspiracy charged in Count Thirteen.

Moving along, Counts Three through Eight and Count Ten charge embezzlements of local union funds by Dan E. Sullivan to his own use, to that of his wife, and to the use of others, in violation of 29 U.S.C. § 501(c). While the expenditures mentioned in those counts were ostensibly allocated to legitimate union purposes, we are of the opinion that the jury could properly

find, as it did find, that the expenditures were unlawful conversions of union funds to the use of Mr. and Mrs. Sullivan and others.

Skipping Count Eleven and Count Twelve, to which we will return, and also passing over Count Thirteen which we have discussed already, Counts Fourteen through Eighteen charged Mr. Sullivan with substantive acts of obstruction of the Labor Department's investigation of the affairs of Local 101. In our opinion there was substantial evidence to sustain the jury's verdicts as to all of those counts.

■ Similarly, we are satisfied that there was substantial evidence to sustain the conviction of Duvall on Count Twenty.

*IV. Inconsistency between Counts Eleven and Twelve.*

Dan E. Sullivan contends that Counts Eleven and Twelve were mutually exclusive and inconsistent, that the government should have been required to elect between them, and that his conviction on both of those counts cannot stand.

Under the provisions of 29 U.S.C. § 431(b) the local union was required to file each year a detailed financial report showing, among other things, union receipts and disbursements during the reporting period. Those annual reports were submitted on Labor Department Form LM–2.

Local 101's report for the calendar year 1977 was prepared and submitted in June, 1978. That report (Government Exhibit 6) was prepared after the International Union had imposed its trusteeship on the local union, and the report was signed by the International Union's Supervisor and Assistant Supervisor.

Schedule 14 of that report shows as Item 6 "Strike Expenses" in the sum of $55,-405.00.

The statute required not only that annual reports be filed but also that underlying supporting records be maintained for at least five years. 29 U.S.C. § 436.

As we have seen, § 439(a) makes it an offense for any person willfully to violate any provision of Subchapter III of the Act, and § 439(c) makes it a specific offense for any person to make false entries in any books, records, reports or statements required by any provision of the subchapter.

Count Eleven of the indictment charged a violation of § 439(c) and specifically charged that false entries had been made willfully by Sullivan in the Strike Expense Journal that he maintained.

We think that there was substantial evidence from which the jury could find that most, if not all, of the entries made in the Strike Expense Journal were false, were known to Sullivan to be false, and were willfully made for the purpose of concealing the embezzlements of local union funds that had been perpetrated between April and November, 1977 and of deceiving any person or agency who or which might have occasion to examine the books and records of the local union.

Sullivan's claim of inconsistency between Count Eleven and Count Twelve and of the impropriety of his conviction on both counts is more troublesome, and neither side has cited us to any authority in support of its contention, although counsel on both sides discuss the relevant statutory provisions.

As we said a moment ago, Count Eleven was based on the false entry provision appearing in § 439(c), whereas Count Twelve was based on the more general prohibition that appears as § 439(a). The charge was that Sullivan willfully failed to maintain underlying records of union finances as required by § 436.

Although Count Twelve does not refer in terms to the Strike Expense Journal with its false entries, it seems clear to us that Count Twelve, like Count Eleven, relates to that journal, and that the claim of the government as to Count Twelve is not so much that Sullivan did not make and preserve "records" but that he did not make and preserve "truthful" and "accurate" records of union expenditures and that the false information would ultimately show up as part of the 1977 LM–2 form.

The two counts, if read in a vacuum, are not facially inconsistent with or repugnant to each other since each count charged a violation of a separate statutory subdivision. Moreover, it is unquestionably true that a person in a position of trust who willfully fails to keep records and who at the same time willfully creates false records or makes false entries in particular records may be found guilty of distinct offenses. Those observations, however, do not solve our problem with Count Twelve considered in the light of the evidence and in connection with Count Eleven. We are concerned here with one record book, the Strike Expense Journal. We do not understand that the government contends that if the journal had contained truthful entries of strike expenses it would not have been an adequate supportive document within the meaning of § 436.

■ What the government seems to be contending is that since the entries in the journal were false, the situation was the same as that which would have existed if Sullivan had failed to make and preserve any record whatever of strike expenses incurred by the local union.

We cannot agree with that theory, and we are satisfied that Sullivan's conviction on Count Twelve must be reversed.

*V.  Exclusion of Defense Exhibits.*

Mr. and Mrs. Sullivan and Mr. Duvall contend, collectively, that the trial judge committed reversible error when he excluded from evidence defendants' proffered Exhibits 12, 36 and 37.

Exhibit No. 12 was an unverified extrajudicial written statement signed by Robert E. Williams, an unindicted co-conspirator, who testified for the government. The statement is dated January 4, 1978; the person to whom it was made is not identified. The statement was to the effect that around the first of May, 1977 Sam Long handed Williams $1500.00 with the request that he make a bomb to be used on construction equipment. Williams stated that he handed the money back to Long and refused to make the bomb.

Exhibit 12 was offered in the course of the testimony of Williams. The transcript indicates that the exhibit was offered for the purpose of impeaching the testimony of Williams on the basis of prior inconsistent testimony which actually may not have been given. However, in connection with this appeal counsel on both sides seem to feel that the real purpose of the offer was to discredit the testimony of Sam Long.

■ The trial judge excluded Exhibit 12 on the ground that its inflammatory effect would prejudicially outweigh any probative value that it might have. *See* Fed.R.Evid. 403. We do not quarrel with that determination. We also think that the item was subject to exclusion by reference to Fed.R. Evid. 608(b).

Exhibits 36 and 37 were copies of union election campaign material that was disseminated in an election held in late 1978 and that was won by a ticket headed by Roy Gooden and Sam Long. Both Gooden and Long testified as government witnesses. As a result of that election Long was elected president of Local 101 and Gooden was elected business manager. The Gooden-Long ticket seems to have been opposed by what we may call the "Moody-Davidson" ticket.

Exhibits 36 and 37 are typed or mimeographed letters signed by Gooden and addressed to all members of Local 101. Both letters are partisan and may be construed as highly critical of Mr. and Mrs. Sullivan and their friends and supporters.

On the reverse side of Exhibit 36 is a cartoon derogatory to candidate Davidson and which also depicts Sam Jones, Floyd Bledsoe and Garold Good, a business agent of the union. Those men are pointing at an unidentified figure who is using a large push broom to sweep out of the "union house" what appear to be a male and female who may be identified as Mr. and Mrs. Sullivan.

■ Exhibits 36 and 37 were offered in the course of the testimony of Roy Gooden. The government objected to the exhibits on

the ground that they were nothing but pieces of political propaganda, and that they were remote in point of time from the dates alleged in the indictment. The trial judge sustained the objection. Defense counsel was permitted to make an offer of proof in the course of which counsel stated that the exhibits were offered to show hatred and ill will on the part of Long, Gooden and others directed at Mr. and Mrs. Sullivan. The offer of proof was accepted by the trial judge, but he adhered to his view that the exhibits were not admissible.

We agree, and we point out that from the overall body of evidence it must have been clear to the jury that as events progressed during late 1977 and on into 1978 a substantial amount of animus developed between Mr. and Mrs. Sullivan and those union members who adhered to them and Messrs. Long, Bledsoe, Gooden and Good, and those who adhered to them.

With respect to all three exhibits here in controversy, it should be kept in mind that questions as to the admission or exclusion of particular items of evidence are addressed largely to the discretion of the trial judge. *United States v. Milham*, 590 F.2d 717, 721 (8th Cir. 1979), and cases cited.

Here, we see no abuse of discretion in the exclusion of the items in question.

### VI. Conclusion.

The judgment of the district court as to Mrs. Sullivan based on her convictions on Counts One and Thirteen of the indictment is affirmed.

The judgment of the district court as to Dan E. Sullivan based on his convictions on Counts Two through Eight, Counts Ten and Eleven, Count Thirteen, and Counts Fourteen through Eighteen is affirmed. The judgment of the district court based on Sullivan's conviction on Count Twelve is reversed, and the conviction on that count is vacated.

The judgment of the district court as to Carl Duvall based on his convictions on Counts Thirteen and Twenty is affirmed.

We see no occasion for further proceedings in the district court.

Affirmed as to all counts of the indictment, save Count Twelve; as to that count the judgment of the district court is reversed and vacated.