UNITED STATES of America, Appellee,

v.

Tim MOORE, Appellant.

No. 89–2396.

United States Court of Appeals,
Eighth Circuit.

Submitted April 9, 1990.

Decided Aug. 13, 1990.

Rehearing and Rehearing En Banc
Denied Oct. 5, 1990.

Larry Dunklin, Little Rock, Ark., for appellant.

Terry L. Derden, Little Rock, Ark., for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and BRIGHT, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Tim Moore appeals from his conviction for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988). Parnell Riley, Moore's friend and

business associate, had asked Moore to pick up a bag at the Little Rock airport after it arrived on a flight from Los Angeles. Law enforcement authorities had been alerted to the possibility that the bag contained narcotics and when Moore retrieved the bag from the airport, the bag was seized. The bag was later found to contain 249.5 grams of cocaine. On appeal, Moore argues that: (1) the testimony of a government witness that she had observed drugs in the home she shared with Moore was so prejudicial that the district court[1] should have declared a mistrial; and (2) the evidence was insufficient to support the verdict with respect to Moore's intent to distribute. We affirm the judgment of the district court.

At trial, a Los Angeles police detective testified that, on May 11, 1988, at approximately 11:30 p.m., she and her partner observed a man, later identified as Parnell Riley, at a ticket counter at the Los Angeles airport. She testified that Los Angeles is well-known as a source city for narcotics. She said that Riley checked a suitcase which was locked with a large padlock, carried a briefcase, and nervously looked around him. The officer determined from the ticket agent that Riley was traveling to Little Rock with a prepaid ticket. The officer and her partner then approached Riley and identified themselves. When the officers asked Riley to present some identification, he complied. Riley denied that he was carrying narcotics and offered to allow the officers to search his briefcase. They did so but found nothing of significance. The officers then asked if they could search the luggage which Riley had checked onto the flight. Riley acted very nervous and asked if he was being detained. The officers informed him that he was not under arrest and he then left the area. The Los Angeles police then contacted the Little Rock Police Department to inform them of the possibility that narcotics were being transported on Riley's flight.

A Special Agent of the Drug Enforcement Administration (DEA) testified that he observed Riley arrive at the Little Rock airport early the next morning. In the baggage claim area, a canine sniff test alerted the authorities to the existence of narcotics in Riley's bag. The officers then observed the bag, identified by its baggage claim number, as it was placed on the conveyor belt. Riley apparently left the airport without claiming the bag.

The DEA Special Agent testified that all baggage except Riley's was eventually claimed. He observed an individual, later identified as Tim Moore, sitting some distance away from the baggage conveyor belt. When Riley's bag was the only one remaining on the conveyor belt, Moore stepped forward and retrieved it. He did not check the numbers or name tags on the bag but nervously looked around the area. The Special Agents then approached Moore, identified themselves, and asked him if he owned the suitcase. Moore dropped the suitcase and answered that he did not own the suitcase nor did he know who did. He told the agents that he had received an anonymous, early morning phone call telling him to pick up the suitcase. He stated that the call was received by his answering machine and that he no longer had the tape recording. When asked about his relationship with Parnell Riley, he stated that he knew Riley only vaguely. The agent testified that he observed a woman, later identified as Darlene Scott, Moore's girlfriend, waiting in Moore's car. Moore was interviewed by authorities later that day and again denied knowing the identity of the person who had called him about the suitcase.

Darlene Scott testified for the government. She said that she and Moore had cohabitated from January to July 1988, but were no longer living together at the time of trial. She stated that Moore and Riley were friends and that they had held private meetings at her residence. Scott testified that Moore had traveled to Los Angeles in late April or early May 1988. She described the events of May 12, 1988, when she accompanied Moore to the airport.

---

1. The Honorable Stephen M. Reasoner, United States District Judge for the Eastern District of Arkansas.

Moore had received a phone call from Riley that morning asking him to pick up the suitcase. He then dressed and went to the airport. She waited in the car while Moore went into the airport. When Moore returned to the car, she said that he told her that Riley had set him up. She stated that Moore also said that he had seen Riley at the airport but that they had not spoken. According to her, Moore acted nervously and commented that the car or house might be bugged. When Scott and Moore arrived home, she said that Moore went into his office and sprinkled chili powder on the floor to conceal odors in case police brought in a dog for smell tests. She testified that Moore then destroyed the tape recording from the answering machine.

Telephone records were introduced into evidence which showed phone calls made from Los Angeles to Riley's pager which were charged to the phone number at the house shared by Moore and Scott. A chemist for the DEA testified that the powder found in the suitcase was 97 percent pure cocaine. The amount of cocaine was determined to be 249.5 grams and had a street value of approximately $58,000.

Moore took the stand to testify on his own behalf. He attempted to challenge Scott's testimony and her credibility. He testified that Riley asked him to pick up the bag at the airport, but admitted that he told the police officers that he did not know whose bag it was nor who had called him.

Moore was tried before a jury and convicted of one count of possession with intent to distribute cocaine. He was sentenced to forty-one months imprisonment. Moore now appeals his conviction.

### I.

■ Moore first argues that Darlene Scott's testimony referring to the presence of drugs in their home was unfairly prejudicial and that the cautionary instruction did not cure its prejudicial impact. Moore urges that the district court should have granted his motion for a mistrial.

Before trial, the court granted Moore's motion in limine preventing the admission of evidence unrelated to the events of May 11 and 12, 1988. This ruling was based upon the fact that Moore was not charged with a conspiracy count but only charged with possession with intent to distribute. Darlene Scott was cross-examined by Moore's counsel and the following exchange took place:

Q: Up to that point and up to a point a few days later, the next day when you cleaned up you never saw any drugs or anything like that?

A: I didn't see any drugs in my house but once, and Tim was present.

Q: Let me ask you this question. We're talking about up to May 12?

A: Up to—no, no, I never saw any drugs. Is that the question?

Q: Up to the time you were cleaning up you never saw any?

A: No.

(Tr. 94). Scott's testimony as to the presence of drugs in the house after May 12 thus violated the in limine ruling.

Following Scott's testimony, Moore's attorney requested a bench conference and the following remarks were made:

Mr. Dunklin: Your Honor, I am very concerned with the statement that Ms. Scott made at the very end of her testimony in reference to her having seen drugs in that house.

The Court: I'll take a look at that. I know what you're talking about. I think the question you asked might have invited that.

Mr. Dunklin: No, sir, it specifically asked up to May 12 and the day or so after when she cleaned up.

(Tr. 96). In response, the court asked Moore's counsel whether he wanted a cautionary instruction or a mistrial. Counsel moved for a mistrial. The court stated that it would take the matter under advisement and did not give a cautionary instruction at that time. Later that same day, the court made the following ruling on the motion for mistrial:

The Court: I reviewed the testimony, and Mr. Dunklin did say, "Up to that day and the day after, did you see anything,

any drugs?", and Darlene Scott did say, "No, the only time I ever saw drugs was later", or something like that, "in Tim Moore's presence". It was not responsive. Based on the case of *United States vs. Muza*, 788 F.2d 1309, an Eighth Circuit case, I don't feel that that is sufficient to entitle Defendant to a mistrial. And I'm going to deny the motion for a mistrial.

(Tr. 110).

The court then offered Moore two options regarding a cautionary instruction. Either the court would instruct the jury that Scott's specific statement should be disregarded, or more generally instruct that all testimony concerning events after May 12 should be disregarded. Counsel chose the latter option and the general instruction was given. Moore now asserts that the cautionary instruction was given so late that it tainted the evidence, and that the prejudice was great in proportion to the evidence of guilt.

It is well-settled that "the decision whether a trial has been so tainted by prejudicial testimony that a mistrial should be declared lies within the discretion of the district court." *United States v. Muza*, 788 F.2d 1309, 1312 (8th Cir.1986). Furthermore, "the admission of an unresponsive, prejudicial statement is 'ordinarily ... cured by striking the testimony and instructing the jury to disregard the remark.'" *Id.* (quoting *Batten v. Scurr*, 649 F.2d 564, 569 (8th Cir.1981)). In order to determine whether Moore's Sixth Amendment right to a fair trial has been infringed by the admission of prejudicial testimony, we consider "the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of [appellant's] guilt." *Id.* (quoting *United States v. Reed*, 700 F.2d 638, 646 (11th Cir.1983) (citation omitted)); *see also United States v. Reed*, 724 F.2d 677, 679 (8th Cir.1984).

We initially observe that it was defense counsel, and not the prosecution, who inadvertently elicited the prejudicial response from Scott. Defense counsel had already asked Scott if she had seen Moore with drugs during the time period prior to May 12 and she had responded negatively. (Tr. 83). The later question may have confused the witness. *See United States v. Webster*, 769 F.2d 487, 491 (8th Cir.1985) (noting that defense counsel had raised the improper subject). The error was not repeated or emphasized and constituted only two lines of testimony out of 159 pages of trial transcript.

In assessing the prejudicial impact, we next consider the strength of the government's case against Moore. Scott did not testify that the drugs which she observed belonged to Moore, were used by Moore, or were sold by Moore. The prosecution did not attempt to rest its case on the drugs which Scott observed; rather, the prosecution focused upon the drugs found in the suitcase seized from the airport. Moore asserts that the evidence used to convict him was scant, and therefore, that the extent of prejudice stemming from the improper testimony was magnified. We reject this contention. It suffices to say that the quantity and quality of the cocaine, Moore's relationship with Riley, and the suspicious circumstances surrounding the suitcase transfer, all demonstrate that there was little likelihood that this isolated comment affected the jury. *See United States v. Vitale*, 549 F.2d 71, 73 (8th Cir.) (per curiam), *cert. denied*, 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393 (1977). Moreover, the district court was in a better position than we are to assess the effect of the inadvertently improper statement on the jury. *United States v. Whitney*, 787 F.2d 457, 461 (8th Cir.1986).

There is no claim that the improper testimony was due to bad faith on the part of the government. The testimony was elicited during defense counsel's cross-examination. *See Muza*, 788 F.2d at 1312; *see also United States v. Cline*, 570 F.2d 731, 737 (8th Cir.1978) (upholding court's refusal to grant mistrial where "there was no hint of prosecutorial instigation or participation").

Furthermore, we are satisfied that the court's cautionary instruction cured the prejudicial effect of Scott's statement. The court instructed the jury that:

I want to remind you and caution you that this case involves only this incident which you've heard testimony, which is confined I believe to May 11 and May 12 of 1988. And any other testimony that might be in the record regarding anything subsequent to that date you are to disregard and it should have no bearing whatsoever on your decision in this case regarding what the Defendant is charged with involving these events of May 11 and May 12.

(Tr. 113). Moore complains that this instruction was given too late after Scott's statement to cure its prejudicial taint. Between the time of her testimony and the court's cautionary instruction, there was brief testimony from two government witnesses. We must "determine with fair assurance whether, in spite of the instruction, the verdict was substantially swayed by the error." *Muza*, 788 F.2d at 1312 (quoting *Batten*, 649 F.2d at 569). We are satisfied that the passage of time was insufficient to unfairly diminish the curative effect of the court's instruction. *See, e.g., United States v. Drew*, 894 F.2d 965, 972–73 (8th Cir.) (upholding court's giving cautionary instruction the day after a tape-recorded conversation was improperly admitted), *cert. denied,* —— U.S. ——, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). The statement was an insignificant portion of the evidence as a whole, and was not emphasized in any manner between its utterance and the cautionary instruction.

In light of the strength of the evidence of Moore's guilt and the court's cautionary instruction, we conclude that any error in the court's treatment of Scott's testimony was harmless. *See Muza*, 788 F.2d at 1313. We have carefully reviewed the record and believe that the jury would have returned a guilty verdict even if the challenged statement had not been made.

## II.

■ Moore also argues that there was insufficient evidence to support the verdict with respect to his intent to distribute. According to Moore, the evidence showed no more than that he was a friend of Parnell Riley and, therefore, his conviction was wrongfully based upon "guilt by association." He also contends that there was no direct evidence that he had knowledge of the bag's contents.

When we consider a challenge to a jury verdict based upon sufficiency of the evidence, we must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The government is entitled to every inference which may reasonably be drawn from the evidence. *United States v. Hudson*, 717 F.2d 1211, 1213 (8th Cir.1983). We "may overturn the verdict only if the evidence properly viewed is such that 'a reasonable-minded jury *must* have entertained a reasonable doubt as to the government's proof of one of the essential elements of the offense.'" *United States v. Holm*, 836 F.2d 1119, 1122 (8th Cir.1988) (quoting *United States v. Hakeem Freeland Segon Funisho Noibi*, 780 F.2d 1419, 1421 (8th Cir.1986)) (emphasis in original); *see also United States v. Rankin*, 902 F.2d 1344, 1345 (8th Cir.1990). To convict Moore, the government had the burden of proving beyond a reasonable doubt that he knowingly possessed with the intent to distribute cocaine. *See* 21 U.S.C. § 841(a). A criminal conviction may "be based properly on circumstantial as well as on direct evidence." *United States v. Sullivan*, 618 F.2d 1290, 1295 (8th Cir.1980). "[I]ntent ... may be proved by circumstantial evidence and frequently cannot be proved in any other way." *Id.*

Viewed in the light most favorable to the government, we believe that there was sufficient circumstantial evidence to support the jury finding that Moore was aware of the contents of the suitcase and thus knowingly possessed the cocaine inside. When Moore received the early morning phone request from Riley, Moore immediately drove to the airport. DEA agents saw Moore in the vicinity of the baggage carousel. When Riley's bag was the only one remaining on the conveyor belt, Moore retrieved the suitcase without checking the claim number or name tag. He then nerv-

ously glanced around the area. When authorities questioned him about the suitcase, he dropped it, denied ownership of it, and attempted to conceal his relationship with Riley.

Darlene Scott testified that Moore and Riley were close friends who had private meetings at her house. She said that Moore had seen Riley at the airport when retrieving the suitcase but had not spoken to him. She testified that Moore had previously traveled to Los Angeles, the source city for the cocaine in issue here. She identified a boarding pass stub, which she had found in Moore's coat pocket, indicating an April 30 flight to Los Angeles. Scott stated that Moore returned to Los Angeles four or five days after that trip. She said that Moore told her that he was flying to Los Angeles to take a package of money for Riley because Moore's physical appearance was that of a businessman. Moore attempts to discredit Scott's credibility as a witness, but issues of credibility are properly resolved by the jury. *Sullivan*, 618 F.2d at 1295. The record also contained phone records indicating that Moore had charged phone calls made from Los Angeles to Riley's pager to the telephone at the home shared by Moore and Scott. Based upon this evidence, we believe that a jury could reasonably infer that Moore knowingly possessed the contents of the suitcase.

Viewing the evidence in the light most favorable to the government, we also believe that Moore's intent to distribute the narcotics is supported by the evidence. Intent to distribute may be inferred from the amount of drugs in Moore's possession. *United States v. Hollman*, 541 F.2d 196, 199 (8th Cir.1976). The evidence revealed that the suitcase in Moore's possession contained 249.5 grams of cocaine, which was found to be 97 percent pure. In *Barnes v. United States*, 777 F.2d 430, 431 (8th Cir. 1985), we held that the jury could reasonably infer from the amount of cocaine, 266 grams in that case, and the value of the cocaine, that the defendant intended to distribute it. The street value of the drugs may also properly be considered in determining whether there was intent to distrib-

ute. *Hollman*, 541 F.2d at 200. There was evidence that the street value of the cocaine seized from Moore could exceed $58,000. Based upon the nature, quantity, and street value of the cocaine, we conclude that a jury could reasonably infer that it was intended for distribution.

■ Finally, we address Moore's argument that the suitcase search was conducted without probable cause in violation of the Fourth Amendment. This argument merits little discussion. The temporary seizure of the suitcase at the airport to conduct the sniff test was based upon reasonable suspicion. *See United States v. Pantazis*, 816 F.2d 361, 363 (8th Cir.1987) (upholding seizure of shoulder bag based upon defendant's deceptive answers coupled with previous suspicious actions). The search of the contents was conducted pursuant to a warrant issued by a magistrate upon sworn affidavit. The warrant was based upon Riley's suspicious activities and the positive alert for narcotics given by the certified canine drug detection unit. We hold that there was no Fourth Amendment violation.

### III.

We affirm the conviction.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

Even in a drug case, the Government bears the burden of proving guilt beyond a reasonable doubt. Yes, defendant Tim Moore possessed the drug, but the sticky question relates to his possession with intent to distribute. On this issue, the Government's proof fails.

Riley, not Moore, owned, carried and shipped the drug in the instant case. When DEA agents began to tail him, he abandoned the shipment and called a friend, defendant Tim Moore, for help with picking it up. Does that show Moore's possession with intent to distribute? Not the way I read the facts.

In the first place, intent to distribute cannot logically be inferred from the

amount of narcotics in the suitcase because the Government made no showing that Moore possessed any knowledge of the amount, whether one gram or a thousand. Moreover, even assuming that a reasonable jury could have concluded that Moore knew or suspected Riley's suitcase of containing drugs, the Government still had to prove that Moore picked up the bag with the intent to distribute its contents. Here, however, the evidence suggested that Moore picked up the suitcase as a favor to Riley, who the Government admits was a close friend. Consequently, the Government could not establish Moore's intent to distribute without at least some proof that either:

(1) Moore had entered into an agreement with Riley (*i.e.,* a conspiracy) to distribute the drugs in the suitcase and intended his possession to further the distribution scheme; or

(2) Moore intended to keep Riley's suitcase and appropriate the drugs himself.

The Government produced absolutely no evidence in support of the latter theory, *i.e.,* that Moore intended to keep the suitcase. Moreover, as to the former theory, the Government's evidence of an agreement between Riley and Moore to jointly distribute the drugs in Riley's suitcase was thin to nonexistent. Indeed, the Government effectively conceded this point during the trial by dismissing, on its own motion, a conspiracy charge that had alleged conduct to this effect.

This case presents a criminal appeal requiring proof beyond a reasonable doubt in support of a jury verdict. Therefore, in this writer's view, the Government cannot sustain a drug conviction merely by putting forth evidence that a defendant possessed "minimum contacts" with an illegal drug or a known dealer. Nevertheless, that is all the Government did with respect to Tim Moore, and, as a result, I would reverse the conviction.