David SCURR, Warden of the Iowa State Penitentiary, Appellant-Cross Appellee,

v.

Michael Charles NICCUM, Appellee-Cross Appellant.

Nos. 79–1527, 79–1528.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 7, 1979.

Decided April 22, 1980.

* The Honorable Albert G. Schatz, United States District Judge, District of Nebraska, sitting by designation.

1. The action was commenced against Lou V. Brewer in his capacity as Warden of the Iowa

Thomas J. Miller, Atty. Gen. and Thomas D. McGrane (argued),. Asst. Atty. Gen., Des Moines, Iowa, on brief for Scurr.

Philip Mears, Iowa City, Iowa, for Niccum.

Before HEANEY and HENLEY, Circuit Judges, and SCHATZ,* District Judge.

SCHATZ, District Judge.

In 1969, Michael Niccum was convicted in the Iowa state court of first degree murder and sentenced to life imprisonment. Following an unsuccessful appeal to the state Supreme Court, *State v. Niccum*, 190 N.W.2d 815 (Iowa 1971), Niccum filed this action [1] for a writ of habeas corpus alleging,

State Penitentiary. Mr. Brewer has since been replaced in that office by David Scurr and the notices of appeal and cross-appeal filed herein reflect the proper substitution of parties.

among other things, that he had been denied his right to a fair trial by the prosecution's failure to provide the defense with potentially exculpatory evidence in advance of trial. In an unreported memorandum opinion, the district court granted the writ on that basis.[2] We affirm.

Evidence adduced at Niccum's trial established that the victim, Linda Boothe, had died from repeated blows to the head administered with a blunt instrument in the back room of a laundromat in Des Moines, Iowa. The state's case against Niccum rested primarily on the testimony of a man named Thomas Logsdon, a personal friend and supposed accomplice of the defendant. Although not purporting to be an eyewitness to the incident, Logsdon testified that Niccum killed Linda Boothe. Niccum in turn offered testimony strongly implicating Logsdon as the perpetrator of the crime. The conflicting versions of the events surrounding the murder offered by these two men are summarized below.

Logsdon testified that he and Niccum drove in Niccum's car from Logsdon's home in Pleasantville, Iowa, to Des Moines on November 20, 1968. According to Logsdon, the purpose of the trip to Des Moines was to carry out a plan suggested by Niccum whereby Niccum and Logsdon would abduct a young woman and take her to a motel where she would be raped and later killed. At about 5:30 in the evening, Niccum pulled his car into the parking lot of the Wakonda Shopping Center in Des Moines and drove to the front of the Arnold Palmer Dry Cleaning Shop. Niccum handed Logsdon a ten-dollar bill and instructed Logsdon to take it into the cleaning store to have it changed and, while there, to see if Logsdon thought Linda Boothe would be an acceptable rape victim. Logsdon returned with the change minutes later and rejoined Niccum in the car, which was now parked in an alley on the south side of the building. Logsdon told Niccum that he thought Ms. Boothe was "pretty nice." At that, Niccum reached into the glove compartment, retrieved from it a pistol and a sap, then left the car and walked toward the front entrance of the cleaning store.

Several minutes later, Logsdon observed Niccum coming toward the car from the opposite end of the alley, carrying in his arms a bundle of clothes and the shaft of a broken golf club. Niccum placed these items in the back seat of the car. Logsdon testified that, as he entered the car, Niccum "told me that he had killed her and that he had to and that she wouldn't stop breathing." Niccum then started the car and drove to a carwash in Carlisle, Iowa. While Logsdon washed the car, Niccum washed blood from his hands and face and changed his clothes. The two then drove back to Pleasantville, stopping at three points along the way to discard Niccum's shoes, the remains of the golf club and Niccum's bloodstained clothes.

Being thus implicated by Logsdon's testimony, Niccum took the stand in his own defense. Niccum admitted that he and Logsdon went to the cleaning store on the day in question. He testified, however, that his purpose in doing so was to leave his gun and sap with the store manager because his wife objected to having guns in the house. He asked Logsdon to take those articles into the store for him along with a note which read, "Red, would you hold these until I contact you." While Logsdon was in the cleaners, Niccum parked the car in the alley, then walked next door to an ice cream store to get an ice cream cone.

After waiting at a nearby corner for several minutes, Niccum went to the cleaning store to meet Logsdon. Finding no one in the outer area of the store, Niccum entered the back room where he found Logsdon

---

2. In his cross-appeal, defendant Niccum claims error in the trial court's denial of Counts I, III and VI of his motion for summary judgment, wherein defendant alleged violation of his *Miranda* rights, violation of his Sixth Amendment right to counsel and prosecutorial misconduct as to certain comments made to the jury during the state's closing argument. In view of our disposition of the state's appeal, it is unnecessary for us to reach those issues.

standing over Ms. Boothe's body. Logsdon had Niccum's sap in one hand, a broken golf club in the other, and Niccum's gun in his pocket. Niccum testified that he then reached over and grabbed his gun from Logsdon, who at this point was mumbling incoherently and moving aimlessly about the room. A voice from the front room yelled the name "Linda." Hearing this, Niccum and Logsdon ran out the back door, down the back hallway, and outside to Niccum's car. Niccum drove the car away from the shopping center.

The jury returned a verdict of guilty against Niccum. In response to a special interrogatory propounded by defense counsel, the jury also found that Thomas Logsdon had been an accomplice in the commission of the crime.

Prior to trial, defense counsel had filed a motion for discovery, Paragraph 5 of which requested that the state be ordered to produce "all statements and any other evidence contained in police report[s] or County Attorney's files or Sheriff's files which are exculpatory in nature." The trial court overruled the request, but offered the following admonition:

Paragraph 5, this asks for anything exculpatory in the files of the police officials or County Attorney's office, and this will be overruled. * * * But I will state that in cases after a trial is completed I will entertain motions to expose the whole police and County Attorney's files and if at that time there is anything exculpatory that the County Attorney and the police have not brought out, it certainly will be a foundation for a new trial, if it is of such a nature that it should have been brought out on their own motion in carrying out their duties under the law as County Attorney and as police.

Following trial, defense counsel was given an opportunity to examine all the evidence and reports in the state's files. Thereafter, defendant moved for a new trial alleging that he has been denied due process by the state's deliberate and wrongful suppression of significant exculpatory evidence. In support of that motion, and again in his petition for habeas relief in this case, defendant points to seventeen statements contained in police reports compiled during the investigation of the Boothe murder.

The statements relied upon by the defendant can be divided into two major groups. The first group, containing thirteen of the seventeen items, relates to the police investigation of one Hugh Hammond, an individual originally suspected of committing the crime. Several items in this group show that a white male, matching Hugh Hammond's description and wearing a tan trench coat, was observed standing immediately outside the cleaning store shortly after 6 p. m. on the night of November 20, 1968. One witness watched as this man entered the store for a period of approximately five minutes, then came back out with his hands in the pockets of his coat. When police arrived at the scene minutes later, the witness approached the cleaning store. He stated that a woman walked up and sought admission to the store, but was turned away by the police. When the witness asked the man in the trench coat if he knew why the woman was not allowed to enter the store, the man, with his hands still in his pockets, turned and walked quickly to his car and drove away. The car was described as a white over red convertible, matching the description of the car owned at that time by Hugh Hammond. Other items in the first group contained statements which tend to establish that Hugh Hammond was a man with an unpleasant and aggressive personality, a short temper and an unusual distaste for women. These statements reveal that Hammond had known the victim for some time and considered her to be "lippy" and a "tease." Finally, this group of reports contains the statement of a female acquaintance of Hammond's. She stated that Hammond told her on November 22, 1968, that he had no alibi for the Boothe murder and asked her, she being a registered nurse, for her professional opinion as to whether Linda Boothe would have been able to

speak following the beating she had received.

The police reports contain no indication as to why the investigation of Hugh Hammond was dropped. Apparently, Hammond was not ruled out as the state's primary suspect until after defendant Niccum had been taken into custody.

The second group of items consists of statements tending to impeach the credibility of trial testimony offered by the state's principal witnesses. Chief among these items are pretrial statements of Thomas Logsdon and his mother concerning Logsdon's activities on the night of the murder. Shortly after he was arrested, Logsdon told police that he and Niccum had gone to the Martinizing Shop in Des Moines where they spoke with two women, that they then drove by Niccum's old apartment, and that they returned shortly thereafter to Pleasantville. That statement obviously conflicts with Logsdon's trial testimony. In addition, Logsdon's mother originally told police that she thought her son had gone rollerskating with Niccum on the evening of November 20, and that the two men returned home at a late but unknown hour. At trial, Mrs. Logsdon testified that Niccum and Logsdon returned home at 9:30 p. m. That testimony was used by the prosecution to discredit Niccum's version of the events following Linda Boothe's murder: Niccum had testified that he and Logsdon returned home some time around midnight.

The defendant contends that pretrial disclosure of the above items of evidence might have affected the outcome of the trial and, therefore, that he was deprived of due process of law in accordance with the rules set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We agree.

In *Brady v. Maryland*, the Supreme Court announced the rule that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196. During the years following that decision, the so-called *Brady* rule was applied with differing results in a variety of contexts, the outcomes often depending upon the nature of the evidence suppressed and the specificity with which the defendant had requested its disclosure. In 1976, the Court clarified the *Brady* rule by enumerating "three quite different situations" in which the rule "arguably applies," each involving "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

In the first type of situation, which does not cover this case, the inquiry is focused primarily on the type of evidence suppressed, to wit: "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.*, 427 U.S. at 103, 96 S.Ct. at 2397.

■ The two remaining situations each covers a wide range of potentially exculpatory evidence, whereby the prosecution's duty to disclose the same is measured in either instance by the "materiality" of the evidence to the question of the defendant's guilt or innocence. Whether evidence is sufficiently material to require its disclosure in a particular case is determined by initially considering whether the defense made a "specific" or merely a "general" request for its disclosure prior to trial. If a specific request was made, evidence is deemed material, and a reversal warranted, if disclosure of the evidence "might have affected the outcome of the trial." *United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2396. If only a general request was made, evidence is considered material only if it "creates a reasonable doubt that did not otherwise exist [when] evaluated in the context of the entire record." *Id.*, 427 U.S. at 112, 96 S.Ct. at 2402.

The significant differences between these two tests of materiality, and the depend-

ence for their application upon the specificity of a defense request, are designed to implement traditional values inherent in the concept of reasonable notice. In *Agurs, supra*, the Court explained the rationale as follows:

> In *Brady*, the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

> In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for "all *Brady* material" or for "anything exculpatory." Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made.

*Id.*, 427 U.S. at 106–07, 96 S.Ct. at 2399.

■ In applying these principles, it is clear that a request for disclosure of particular information cannot be labeled as either "specific" or "general" in a vacuum. Rather, the question must be asked whether, under all the circumstances presented by the case, the request was such as to give the prosecution reasonable notice of what the defense desired. In other words, "specificity" is a function of several factors, includ-

ing the literal language of the defense request itself, the apparent exculpatory character of the evidence sought, and the reasonableness of the explanation, if any, for which the evidence was not exposed or was not considered to be material by the prosecution. In the instant case, we conclude that the prosecution was on reasonable notice that the defendant desired the reports regarding the police investigation of Hugh Hammond and the prior inconsistent statements of Thomas Logsdon. We also conclude that those items are material to the question of the defendant's guilt or innocence.

Looking at Paragraph 5 of the defendant's motion to produce, quoted in part above, we agree with the state that the language of the defense request is too broad, by itself, to constitute a specific request. However, we conclude that the following colloquy between court and counsel at the hearing on the motion to produce significantly clarified the defendant's intentions:

> THE COURT: I assume anything exculpatory will include any evidence you might have had that someone else had done it. In other words, it might be anything that tends to be exculpatory as to this Defendant is, I assume, what they have in mind.

> [DEFENSE COUNSEL]: This was intended by the defendant when he filed this, including any statements that were furnished by Tommy Logsdon here, or police reports that involved the obtaining of this information from Logsdon.

> THE COURT: * * * I assume that that includes oral as well as any written statements.

> [DEFENSE COUNSEL]: It was intended to include both, sir.

In view of this clarifying discussion, we are persuaded that the prosecution could not reasonably have overlooked or justifiably considered irrelevant the inconsistent alibi of Thomas Logsdon or the police files relating to Hugh Hammond. By this, the court does not intimate that the state must

in every case disclose all information that it may have concerning any individual who might have been a suspect during the initial stages of a criminal investigation. Nor do we suggest that a request for evidence that "someone else did it" will in every case be considered a specific request as to all such information that might exist in the state's files. But, in this instance, where the police reports are so strongly suggestive of the possibility of another perpetrator, where the state's case against the defendant rests almost entirely upon the credibility of a single alleged accomplice, and where no explanation appears for the shift in focus from the third party to the defendant, we have no difficulty concluding that the state was well aware of what the defendant desired by Paragraph 5 of his motion to produce. We also have no difficulty concluding that pretrial disclosure of that information might have affected the outcome of the trial.[3] Accordingly, the judgment of the district court is affirmed.

---

3. Much emphasis has been placed on this aspect of the case, the state urging that a new trial is not warranted here because the theory of defense actually used, as reflected in the trial testimony of the defendant, is hopelessly inconsistent with the possibility of a third party perpetrator. The state would thus have the court evaluate the potential impact of the undisclosed evidence in the context of the entire record, the standard of review required by the more stringent test of materiality applied in situations where only a general request for disclosure had been made. We reject this suggestion. For it amounts, in effect, to a claim that evidence wrongfully suppressed by the prosecution in advance of trial can be considered material only if it supports the particular defense strategy actually employed by the defendant, a strategy which, of necessity, would have been selected without the benefit of evidence the defendant was entitled to consider and use. We decline to decide whether the evidence suppressed in this case is irreconcilable with the defendant's trial testimony, or whether that evidence would create a reasonable doubt on the record as a whole. Instead, it will suffice to observe that the withheld information need only be, and is, significantly supportive of a claim of innocence on the part of the defendant. Having said this, we refuse to bind the defendant to a trial strategy selected in the partial vacuum created by the state's wrongful suppression of material evidence.