**UNITED STATES of America,
Plaintiff/Respondent,**

v.

**Leonard PELTIER, Defendant/Petitioner.**

**Crim. No. C77–3003 (Civ. No. A3–82–60).**

United States District Court,
D. North Dakota,
Southeastern Division.

Dec. 30, 1982.

As Amended Jan. 3, 1983.

Rodney S. Webb, U.S. Atty., D.N.D., Fargo, N.D., Evan L. Hultman, U.S. Atty., N.D.

Iowa, Cedar Rapids, Iowa, Richard Vosepka, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., Lynn E. Crooks, Asst. U.S. Atty., D.N.D., Fargo, N.D., for plaintiff/respondent.

William M. Kunstler, New York City, Michael E. Tigar and John J. Privitera, Tigar, Buffone & Doyle, Washington, D.C., Bruce Ellison, Rapid City, S.D., for defendant/petitioner.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Petitioner Leonard Peltier has filed a motion to vacate judgment and for a new trial pursuant to 28 U.S.C. § 2255.[1] Petitioner Peltier, Robert Eugene Robideau, Darrell Dean Butler, and James Theodore Eagle were charged in a two count indictment with the murders of two Special Agents of the Federal Bureau of Investigation in violation of 18 U.S.C. §§ 2, 1111, and 1114. Robideau and Butler were jointly tried by a jury and were acquitted. The charges against Eagle were dismissed by the government. Subsequent to the Robideau-Butler trial, petitioner Peltier was tried by a jury, was convicted on both counts, and was sentenced to life imprisonment on each count, the sentences to run consecutively. The conviction was affirmed on appeal. *United States v. Peltier,* 585 F.2d 314 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

Petitioner, through counsel, filed the § 2255 motion at issue here on April 20, 1982. The matter was briefed extensively and came at issue on October 1. The motion was filed subsequent to the receipt by petitioner's counsel of documents from the government in a pending federal action filed under the Freedom of Information and Privacy Acts, 5 U.S.C. §§ 552 and 552a. *Peltier v. Department of Justice,* CA No. 79–2722 (D.D.C.). According to petitioner, this newly discovered evidence indicates "that the government engaged in deliberate deception of this Court and the jurors by the presentation of known false evidence and the suppression of exculpatory evidence in order to obtain a conviction." *Petitioner's Motion to Vacate Judgment and for a New Trial* at 1, *Peltier v. United States,* Crim. No. C77–3003 (Civil No. A3–82–60) (D.N.D. filed April 20, 1982). Petitioner claims that these actions by the government violated his fifth amendment right of due process of law and violated his sixth amendment right of confrontation and compulsory process.

Petitioner's Motion to Vacate Judgment and for a New Trial is based almost exclusively upon a claimed due process violation resulting from the alleged failure of the government to disclose exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The nondisclosure of *Brady* materials is cognizable in a section 2255 motion. *Lindhorst v. United States,* 658 F.2d 598,

1. Section 2255 provides, in pertinent part, the following:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise .open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

601 n. 3 (8th Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982); *Houser v. United States,* 508 F.2d 509, 517–18 (8th Cir.1974). Under *Brady* "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196. "Suppression" in the context of *Brady* material has been held to mean nondisclosure. *Lindhorst v. United States,* 658 F.2d at 605 n. 8, citing *United States v. Agurs,* 427 U.S. 97, 106–07, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342 (1976). *See also Evans v. Janing,* 489 F.2d 470, 475 (8th Cir.1973).

Petitioner specifically alleges nondisclosure of the following as *Brady* violations: (1) a memorandum indicating that tests matching the .223 shell casing found in the trunk of Agent Coler's car with Peltier's AR–15 rifle were conducted with negative results, and documents indicating that it is highly unlikely that the government's ballistics expert failed to study the .223 casing for several months; (2) FBI reports demonstrating the involvement of other vehicles in the incident, specifically a red pickup, a red Scout, a red jeep, and an orange and white pickup; (3) documents indicating that it would be difficult, if not impossible, for FBI Agent Frederick Coward, Jr., to have identified Peltier at the scene through a high power rifle scope, given the distance and weather conditions involved; (4) FBI teletype and memoranda indicating the existence of conflicting pathology reports; (5) material gathered by the FBI during its investigation inculpatory of several individuals not prosecuted for the deaths of the agents; and (6) documents suggesting that persons other than those identified to the jury were present at the scene during the confrontation.

In considering petitioner's contention that he is entitled to a new trial, the focus must be on the materiality, to either guilt or punishment, of the evidence alleged to have been suppressed. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court discussed the three quite different situations to which *Brady* arguably applies. Each involves the discovery after trial of information which had been known to the prosecution but unknown to the defense. In the first situation, "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known of the perjury." *United States v. Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397 (footnote omitted). A conviction obtained by the knowing use of perjured testimony is considered by the Court to be "fundamentally unfair" and is to be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (footnote omitted). As summarized in *United States v. Runge,* 593 F.2d 66, 73 (8th Cir.), *cert. denied,* 444 U.S. 849, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979):

> Where the use of known perjury involves prosecutorial misconduct, it constitutes "corruption of the truth-seeking function of the trial process." The government may be responsible even if the prosecutor did not actually know the testimony was perjured, but should have known, or if he or she did not elicit false testimony, but allowed it to go uncorrected when it appeared. Even false testimony which merely impeaches a witness' credibility may require a new trial.

*Id.* (citations omitted). *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Lindhorst v. United States,* 658 F.2d 598, 602 (8th Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982). Petitioner argues that this standard of materiality should be applied to evidence of ballistic tests, other vehicles, and scope sighting, alleged to be newly discovered.

The second situation discussed in *Agurs* to which *Brady* applies is characterized by a pretrial request for specific evidence. *United States v. Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397. The standard of materiality when

a specific request has been made is whether "the suppressed evidence might have affected the outcome of the trial." *Id.* The Court noted that

> [a]lthough there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

*Id.* at 106, 96 S.Ct. at 2398. Petitioner argues that this standard of materiality should be applied to the evidence concerning the autopsy reports, Jimmy Eagle and other suspects.

The third situation to which *Brady* applies, according to the *Agurs* Court, is where exculpatory information is possessed by the prosecution but unknown to the defense attorney. In such cases the duty of the prosecutor is the same whether defense counsel makes a general request or no request at all. If the prosecutor fails to disclose the information and the omission is of sufficient significance to result in the denial of defendant's right to a fair trial the prosecutor will have violated his constitutional duty of disclosure. However, the mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. The reviewing court must evaluate the omission in the context of the entire record. If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. *Id.* at 107–113, 96 S.Ct. at 2399–2402. Petitioner in this case does not appear to be relying on this "third situation" application of *Brady*.

## I. PERJURED TESTIMONY

Petitioner has not demonstrated that the prosecution's case, especially with regard to the evidence of ballistics tests, other vehicles, or the scope sighting, included perjured testimony and that the prosecutor knew or should have known of the perjury.

### A. Ballistics Testimony of Special Agent Hodge

■ Relying upon an alleged inconsistency between the trial testimony of Special Agent Evan Hodge, a specialist in the Firearms and Tool Marks Identification Unit of the Federal Bureau of Investigation (FBI), and a recently discovered FBI teletype, petitioner has alleged that Special Agent Hodge intentionally misled the jury or more probably perjured himself when he testified at the trial of Peltier. Petitioner alleges that Hodge testified that a conclusive firing pin comparison between the .223, Ex. 34B, shell casing found in the trunk of Agent Coler's car, and the AR–15 rifle recovered from Wichita, Kansas, could not be performed due to the rifle's damaged condition, but that newly discovered evidence indicates that a firing pin comparison between the rifle and the .223 casing was in fact performed and produced negative results. The alleged newly discovered evidence is an October 2, 1975 FBI teletype included among the FOIA materials provided to petitioner. The teletype reads in pertinent part: "Recovered .223 caliber Colt rifle . . . contains different firing pin than that in rifle used at RESMURS scene." Appendix at 107, *Motion to Vacate Judgment and for a New Trial*.

Petitioner has misstated Hodge's trial testimony. The record shows his testimony to be as follows:

> Government's Exhibit 34–A, because of it's condition, could not be fired. However, I could remove the bolt out of Government's Exhibit 34–A and place it in another firearm, AR–15 rifle, and test fire it in that manner.

> This I did and compared the markings, microscopic markings placed on the car-

tridge cases that I fired using the bolt of Government's Exhibit 34–A with Government's Exhibit 26–, I'm sorry, 34–B.

Q When did you make the comparison on Government's Exhibit 34B?

A I don't really know the day that I did it. It would have been sometime late in the year 1975 or early 1976.

Q And do you have an opinion as to the comparison which you made between the known items fired from the firing pin of [the AR–15 rifle from Wichita] ... and the firing pin impression of ... [the .223 casing found in the trunk of Coler's car]?

A No sir. I could not form a conclusion. But based on either the firing pin or the breach face as to whether the ... [.223 casing] had been fired in [the AR–15 rifle]. . . .

Trial Transcript at 3234–35. Agent Hodge then went on to discuss the conclusions he was able to make on the basis of ejector mark comparisons.

The teletype and an October 31, 1975 laboratory report authored by Hodge are obviously related. The laboratory report was received in evidence as Exhibit 135. It referred to tests done on some .223 shell casings and the AR–15 rifle, Exhibit 34A. The October 31, 1975 laboratory report appeared to be inconsistent with a February 1, 1976 laboratory report also authored by Hodge which referred to tests done on shell cases recovered from the general RES-MURS area. Exhibit 34B, found in the trunk of Special Agent Coler's automobile, was specifically covered in the report. The court allowed the inconsistent earlier report to be received in evidence and go to the jury even though defense counsel declined to give Hodge a Rule 613(b), Federal Rules of Evidence, opportunity to explain the discrepancy. Because the inconsistent report was admitted, even though inadmissible under the rule, the court did not permit defense counsel to argue the discrepancy. The jury in its consideration of the inconsistent reports could have concluded on the basis of Hodge's testimony that the .223 shell casings referred to in the October re-

port did not include the casing, Exhibit 34B, found in the trunk of Coler's automobile. Petitioner's allegation that Hodge gave perjured testimony is a clear misstatement of the record and is obviously without substance or materiality.

### B. Evidence of Other Vehicles

■ Petitioner next alleges that the government deliberately deceived the court and the jury by suppressing reports and statements of the deceased agents describing open vehicles, such as jeeps and pickups, as having been involved in the initial chase and later escape. Even though "bits of contradictory testimony ... occasionally emerged," *Motion to Vacate Judgment and for a New Trial* at 20, petitioner argues that there was limited evidence available to the defense as to the *actual* existence of vehicles other than Peltier's van having been chased that day.

In placing the evidence of other vehicles in the first category of *Agurs,* petitioner is apparently relying on the conflicting testimony of government witness Michael Anderson on this issue. He claims that Anderson's trial testimony is of a mysterious origin, *Motion to Vacate Judgment and for a New Trial* at 34, and that the alleged suppression of a grand jury transcript raises the inference, along with Anderson's pretrial statements, that he was in Tent City at the time the shooting started and not on the roof of the Siers residence. *Id.* n. 39. Additionally, in support of his claim that Anderson perjured himself, petitioner sets out examples of arguably inconsistent testimony of witnesses, inferring that the inconsistencies arose because one or more of the witnesses, principally Anderson, deliberately lied under oath and that the government knew or should have known that he was perjuring himself.

Petitioner's claim that Anderson may have perjured himself is without merit. At the time of trial, conflicting evidence was presented to the jury as to what Anderson said he saw and whether he was in a position to see the vehicle being followed by Special Agents Coler and Williams. Addi-

tionally defense counsel did a thorough job of attempting to impeach Anderson's credibility. Anderson testified at trial that he was denied an attorney during interrogation, Trial Transcript at 839, was threatened with a beating by Special Agent Adams, *id.* at 841–43, and was not prosecuted for a burglary in Arizona, weapons and explosives charges in Kansas, or in this case, in exchange for his testimony. *Id.* at 845. Wilfred Draper testified at trial that Anderson had been with him, Joe Stuntz, Norman Charles and Norman Brown in Tent City when the shooting started. *Id.* at 913. Assessing the credibility of the witnesses lies within the province of the jury. *United States v. Sullivan,* 618 F.2d 1290, 1295 (8th Cir.1980). Petitioner has alleged the legal conclusion, unsupported by facts, that Anderson perjured himself. The arguments relating to other vehicles is but a repeat of issues presented to the jury, which issues were thoroughly argued. If there is any evidence available from which one might conclude perjury was involved, that evidence was presented to the jury or available to defendant at trial.

### C. Special Agent Coward's Identification of Peltier at the Murder Scene

■ Petitioner next claims that the FOIA documents contain a memo concerning an attempt by the government mid-trial to duplicate the sighting of Peltier at the murder scene by Special Agent Frederick Coward, Jr. Special Agent Coward testified at trial that he recognized Peltier as one of the four individuals running away from the Jumping Bull house. Trial Transcript at 1168. The identification was made at a distance of greater than 800 yards, *id.* at 1303, through a 2 × 7 power rifle scope, *id.* at 1168, while the individuals were running at an angle but slightly in his direction. *Id.* at 1169. Agent Coward was extensively cross-examined regarding the sighting.

Here again the allegation of perjury appears to be based on arguably inconsistent testimony of witnesses and a misinterpretation of the trial record. At trial petitioner attempted to impeach Special Agent Cow-

ard through the testimony of James R. Hall, a local firearms dealer. Mr. Hall testified on April 8, the 20th day of the trial, that he had tried "day before yesterday" to duplicate the sighting described by Special Agent Coward, but could not, even though his subject was standing still and facing him. He was accompanied by an FBI agent. *Id.* at 3785–3790. Among the alleged undisclosed evidence, petitioner includes a memorandum sent to Special Prosecutor Hultman, on April 6th, the day of Witness Hall's test, relating to a test made that day. It appears quite obvious the test referred to is the test conducted that day by defense Witness Hall, but even if it were a separate test by the FBI the same day, it would not be material. Evidence of other failures to duplicate the sightings under the conditions described by Agent Coward do not substantiate a claim of perjury on the part of Agent Coward. It is the province of the jury to assess the credibility of witnesses. *United States v. Sullivan,* 618 F.2d at 1295.

Petitioner also relies on documents indicating that the FBI questioned other persons who possessed vision enhancing devices in the RESMURS area on June 26. The sightings by others were done under different conditions than the sighting by Agent Coward, *see* Appendix at 566, *Motion to Vacate Judgment and for a New Trial* (binoculars); *id.* at 568 (binoculars); *id.* at 571 (binoculars); *id.* at 574 (scope rifle; no other conditions specified), and as such do not contradict the sightings done by Agent Coward. Petitioner has therefore failed to prove perjury with regard to the sighting of Peltier made by Agent Coward.

■ Because he has failed to demonstrate the use of perjured testimony on the part of government witnesses, petitioner is not entitled to use the *Agurs* "any reasonable likelihood that the false testimony could have affected the judgment of the jury" standard of materiality.

### II. THE STANDARD OF MATERIALITY IN THE ABSENCE OF PERJURED TESTIMONY

■ As previously discussed in this opinion, the question of whether nondisclosed

evidence is sufficiently material to require its disclosure in cases not involving the use of perjured testimony is determined by initially considering whether the defense has made a specific or merely a general request for its disclosure prior to trial. If a specific request was made, evidence is deemed material if its disclosure might have affected the outcome of the trial. *United States v. Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397. If only a general request or no request was made, evidence will be considered material only if it "creates a reasonable doubt that did not otherwise exist when evaluated in the context of the entire record. *Id.* at 112, 96 S.Ct. at 2401.

■ A request for disclosure of particular information cannot be labeled as either "specific" or "general" in a vacuum. *Scurr v. Niccum,* 620 F.2d 186, 190 (8th Cir.1980). "Rather, the question must be asked whether, under all the circumstances presented by the case the request was such as to give the prosecution reasonable notice of what the defense desired." *Id.* Specificity is therefore a function of several factors including the literal language of the defense request itself, the apparent exculpatory character of the evidence sought, and the reasonableness of the explanation for the prosecution not exposing the evidence or not considering it to be material. *Id.* To determine whether this case involved a general or a specific request, it is therefore necessary to examine the record of defense requests and government representations.

The file reveals that there were no general discovery motions filed by the defendant in this case chiefly due to an agreement concerning discovery that had been made between defense counsel and the United States Attorney's office. The agreement was to the effect that the United States Attorney's Office would provide the defendant with "any statements made by the Defendant; any record of a previous conviction of Defendant; all documents and tangible objects relevant to this case; and the reports of any examinations or tests made in connection with this case." *United States v. Peltier,* Crim. No. C77–3003 (Mo-

tion for Leave to File Additional Pretrial Motions filed Feb. 18, 1977). The court was to be involved only if a dispute regarding discovery arose. *Id.* At the pretrial conference held in this case on January 14, 1977, Evan Hultman, the United States Attorney for the District of Iowa represented that "there has been literally total disclosure in this case," Transcript of Pretrial Conference at 29, *United States v. Peltier,* Crim. No. C77–3003 (Jan. 11, 1977), and that "all documents, literally all of the 302s literally are within their possession right now." *Id.* at 32.

In light of these representations, petitioner claims that all *the critical* information concerning the autopsies and evidence relating to other suspects was thought to have been produced. He apparently knew that not *all* the information possessed by the government concerning this case had been produced. For example, during the trial defense counsel made a specific *Brady* request regarding the .223 cartridge casing found in the trunk of Agent Coler's car. The request was made orally and specifically requested disclosure of the name of the person who prepared the affidavit signed by Special Agent Cunningham stating that he had found the casing, and any cover letters or other documentation accompanying the affidavit when it was sent to Special Agent Cunningham. Trial Transcript at 2166–67. The fact that defense counsel felt it necessary to make specific requests for additional *Brady* material during trial indicates their awareness that any previous requests, including their agreement with the government, were of a general, rather than a specific nature.

■ Petitioner claims the discovery requests made by defense counsel in the Iowa trial of codefendants Robert Eugene Robideau and Darrell Dean Butler qualify as specific *Brady* requests for the purposes of his trial. However, he cites no law supporting his position that the specific requests filed by the attorneys for other codefendants in a separate trial puts the government on notice as to what is specifically desired by defense counsel in this trial. It is the

responsibility of the attorneys representing a defendant to select areas they believe may be the source of exculpatory material if they wish to increase the government's responsibility for production of information.

 Further, the record is clear and the court takes judicial notice that petitioner's attorney in these 2255 proceedings, Bruce Ellison, participated as one of the defense lawyers in the Cedar Rapids trial. He also participated in the role of an investigator in the Peltier trial. Also, John Lowe, one of the lead lawyers in the Iowa trial, was also a lead lawyer in the Peltier trial. It seems quite obvious that counsel for petitioner were fully cognizant of all disclosures and all evidence produced in the Iowa trial. No showing has been made to this court that specific requests for disclosure were not complied with. Under the teaching of *Agurs,* the court finds that petitioner's requests prior to trial and at trial were general requests.

 In the absence of a specific request for production of evidence, *Agurs* also teaches that an omitted disclosure, as previously stated in this opinion, is not of constitutional significance unless viewed in the context of the entire record, it creates a reasonable doubt as to a petitioner's guilt that did not otherwise exist. There is no constitutional requirement that the prosecution make a complete and detailed accounting to defense of all police investigatory work. *Agurs* 427 U.S. at 109, 96 S.Ct. at 2400. "Compliance with *Brady* neither requires full disclosure as in civil cases, nor permits a combing of the prosecutor's files in search of evidence possibly favorable to the accused." *United States v. Smith,* 552 F.2d 257, 262 (8th Cir.1977) (citations omitted). It would be "unreasonable" to impose upon the prosecutor the duty of personally searching agency files for favorable evidence. *Id.*

 Additionally, the prosecution has no obligation to communicate preliminary, challenged or speculative information. *Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). Therefore, as set out in *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." However, the prosecutor is presumed to recognize the significance of evidence highly probative of innocence in his file. *Id.* (citation omitted).

 Applying the foregoing legal analysis to the facts in this case, it is apparent there has been no purposeful evasion of the prosecutor's duty amounting to suppression. Much of the evidence petitioner labels *Brady* material is preliminary, challenged or speculative information. Examples of this class of evidence are the documents reporting the preliminary autopsy findings of Dr. Bloemendaal, the possible involvement and presence of other people, and the various descriptions of the vehicle the agents followed into the Jumping Bull Compound.

Additionally, when evaluated in the context of the entire record, none of the evidence petitioner claims was withheld from him is such that it would create a reasonable doubt that did not otherwise exist. According to the United States Court of Appeals for the Eighth Circuit, the strongest evidence that Peltier committed or aided and abetted in the murders was as follows:

1. The van that the agents followed into the Jumping Bull Compound was occupied by Peltier, Norman Charles and Joseph Stuntz.

2. At the time, Peltier had access to information that he was being followed by FBI agents. One of the occupants of the van, Norman Charles, had been picked up along with two other AIM members, Anderson and Draper, by Coler and Williams the day before. The three had been transported to Pine Ridge in Williams' car, and were later released. . . .

3. Peltier had reason to believe that the agents were looking for him, rather than Jimmy Eage. He stipulated at trial that there was an arrest warrant outstanding, charging him with attempted

murder. Upon his arrest in Canada months later for the murders of the agents, Peltier remarked that the two agents were shot when they came to arrest him.

4. Michael Anderson, one of the AIM members who was firing at the cars from one of the houses in the Jumping Bull Compound, testified that after both sides had been shooting at one another from a distance, and at least one of the agents had been wounded, he saw Peltier, Robideau and Butler standing down at the agents' cars. Peltier at the time was holding an AR–15. Shortly after he saw the three down at the agents' cars, he began to walk back to Tent City, a distance of about a quarter of a mile. When he arrived at Tent City, Peltier, Robideau and Butler were already there, as was Williams' car. F.B.I. agents who later searched the area recovered Williams' badge and billfold on the ground near the junction of the roads leading to the houses and Tent City. It was at this junction that Peltier's van had stopped shortly before the firing commenced.

5. According to the doctor who performed the autopsies, the agents were shot with a high velocity, small caliber weapon. Peltier's AR–15, the civilian counterpart of the M–16, was the highest velocity weapon fired that day. No other person was seen by any trial witness on June 26 with an AR–15. Peltier carried his AR–15 out with him when he and the other participants of the shootout escaped from the reservation and fled to the Rosebud Reservation, where they remained for some time before splitting up. Robideau, Charles and Anderson went south after leaving Rosebud. Anderson testified that he loaded their car with weapons, one of which was an AR–15, before they left South Dakota. On September 10, 1975, the car exploded on the Kansas Turnpike, and police recovered from the car the AR–15 which the government contended Peltier used on the day of the murders.

6. Ammunition components linked ballistically to the same AR–15 were found at the crime scene. The ballistics expert was unable to fire the AR–15 because it had been damaged in the explosion on the Kansas Turnpike. However, he was able to remove the bolt from it, place the bolt in another AR–15, and test fire the replacement AR–15. The expert testified that a .223 cartridge casing found in the trunk of Coler's car had been loaded into and extracted from the AR–15. He also testified that a .22 caliber copper bullet jacket found in the ground underneath the bodies of Coler and Williams had rifling impressions consistent with the rifling of the barrel of an AR–15. There was no testimony to indicate that either Robideau or Butler was seen the afternoon of the murders with a weapon that fired .22 caliber bullets.

7. Wilford Draper, a member of the escape party that left Tent City the evening of the murders, testified that he overheard Peltier, Butler and Robideau discussing certain details of the murders on the evening of June 26, 1975.

8. Peltier was stopped by police months later in the State of Oregon. He fled the scene, turning to fire on one of the police officers. The motor home in which he was riding was searched, and Special Agent Coler's revolver was found in a bag bearing Peltier's thumbprint.

*United States v. Peltier,* 585 F.2d at 319–20.

This court does not find that the recently disclosed government documents cast doubt upon four of the eight factual findings listed above as contended by petitioner, or any of them. The documents indicating that Special Agents Williams and Coler were following a vehicle other than a red and white van do not negate or discredit the eyewitness testimony presented at trial. Michael Anderson, Trial Transcript at 772–75, Angie Long Visitor, *id.* at 2267 and 2672, and Norman Brown, *id.* at 1514–15, identified Peltier's red and white van and placed it at the scene of the shooting. No other cars except those belonging to the F.B.I. agents and two junked vehicles (a station wagon and a green car) were identified as being in the area. *Id.* at 2686–87. The

defense attempted to rebut this testimony by arguing that it was a vehicle other than Peltier's van that Coler and Williams followed into the Jumping Bull Compound. It is apparent from the trial transcript that Special Agent Williams' radio transmission concerning a vehicle he was about to chase was heard differently by different people. For example, Special Agent Adams testified that Williams had referred to the vehicle as a "pick-up," Trial Transcript at 72, and Special Agent Waring testified that Williams talked about a "red and white vehicle." *Id.* at 1836. Defense exhibit 75, a portion of an FBI radio log, contained radio transmissions mentioning a "red pick-up." The FOIA documents reveal that the possible involvement of other vehicles in the incident was explored by the FBI. However, none of the documents place any vehicles at the crime scene at the time of the murders other than Peltier's van and an inoperative vehicle belonging to June Little. The documents are cumulative of the evidence presented. at trial and in the context of the entire record do not create a reasonable doubt as to Peltier's guilt that did not otherwise exist.

Likewise, petitioner is not entitled to relief on the basis of documents indicating that persons other than those charged with the murders were actually present at the murder scene and were at least likely to have committed the killings. Petitioner claims that the recent disclosures show not only the identity of other persons, but the FBI's belief as to their actual or likely involvement in the killings of Special Agents Coler and Williams. Petitioner was tried, however, on the theory that he was guilty of aiding and abetting in the murders of the agents. The involvement of others was conceded throughout the trial. In closing argument the government conceded that Leonard Peltier "didn't do everything" involved in the deaths of the agents, Trial Transcript at 4972, but contended that he was "responsible" for them. *Id.* at 4974.

Support for the government's contention can be found in evidence presented at trial. As noted by the Court of Appeals, "[t]he evidence of Peltier's guilt was strong."

*United States v. Peltier,* 585 F.2d at 325. Several witnesses described him as being the leader of the group. He conceded in opening statement that he was present the day of the shooting. Trial Transcript at 47. Mike Anderson testified that the vehicle the agents were chasing belonged to Peltier and that Peltier, Joseph Stuntz and Norman Charles were in it. *Id.* at 775. Anderson also testified that the agents chased Peltier's van into a valley where it stopped. *Id.* He next saw Peltier, Charles and Stuntz "hop out" of the van and the FBI agents follow the van "down the hill." *Id.* at 776. He then heard shooting. *Id.* Angie Long Visitor identified Peltier's van as the vehicle parked at the fork in the road. *Id.* at 2671–72. Peltier was one of only three individuals seen near the bodies of the agents. *Id.* at 788. A shell casing was found in the trunk of Special Agent Coler's car which had been ejected from a weapon of the type Peltier was using that day. *Id.* at 788 and 3247. Special Agent Coler's revolver was found in a paper sack under the seat of the recreational vehicle Peltier was driving before he fled on foot to Canada. *Id.* at 2345–46. Peltier's fingerprint was found on the sack. *Id.* at 2512.

No eyewitness to the actual, final killing was produced at trial. Petitioner's newly discovered evidence does not demonstrate that Peltier was not involved in the killings. The most that it shows is that other individuals may also have been involved. Therefore, in the context of the entire record, the newly discovered evidence indicating the possible involvement of other persons does not disclose anything material that was not disclosed at trial and clearly does not create a reasonable doubt as to petitioner's guilt that did not otherwise exist.

Additionally, the recently discovered documents concerning the pathology evidence do not create a reasonable doubt as to petitioner's guilt that did not otherwise exist.

At trial, the testimony of two pathologists was presented. Dr. Bloemendaal testified that in his opinion Agent Williams' gunshot wound to the head was "[t]he last

gunshot wound that he had, [and] would have been immediately fatal." Trial Transcript at 593. Dr. Bloemendaal also testified that the projectile that had entered Williams' head and hand was "a high velocity missile." *Id.* at 593. Dr. Bloemendaal's opinion regarding the sequence of Williams' wounds was corroborated by Dr. Thomas Noguchi. *Id.* at 639. Additionally, Dr. Noguchi testified that Agent Coler's head wounds were also caused by a high velocity weapon. *Id.* at 635.

Petitioner alleges that until the FOIA documents were disclosed, he was unaware of a prior contradictory report authored by Dr. Bloemendaal. It is claimed that although Dr. Bloemendaal testified that the last gunshot wound was fatal, he had concluded otherwise from the first moments of the completion of the Williams autopsy.

It is inconceivable to this court how petitioner can claim that he was unaware of Dr. Bloemendaal's earlier opinion regarding the sequence of the wounds and therefore that this evidence is newly discovered. Early in the investigation FBI Director Clarence Kelly reported at a news conference that "[w]e know that the first wound suffered by Agent Williams was in his head and it killed him instantly." Text of News Conference of Clarence M. Kelly, Director Federal Bureau of Investigation at Century Plaza Hotel (July 1, 1975) (Appendix at 220, 223, *Motion to Vacate Judgment and for a New Trial*). In addition to this report of the autopsy findings, the autopsies were introduced into evidence at trial as Trial Exhibit 7. Noted in Dr. Bloemendaal's autopsy of Agent Williams is the fact that only a minimal amount of hemmorage was present in Agent Williams' side and arm wounds, indicating that these wounds may have been sustained after death. Trial Exhibit 7 at 7, Autopsy of Ronald Williams performed by Dr. R.D. Bloemendaal (June 27, 1975).

Even assuming that petitioner's counsel was unaware of the earlier opinion of Dr. Bloemendaal concerning the sequence of Agent Williams' wounds, this newly discovered evidence, evaluated in the context of the entire record, does not create a reasonable doubt as to Peltier's guilt. Evidence of an earlier contrary opinion would merely impeach the pathology evidence presented at trial. Indeed, petitioner's counsel interjected nine times during the direct and cross-examination of Dr. Bloemendaal and Dr. Noguchi that the pathology was not being challenged. Trial Transcript at 48, 49, 568, 586, 604, 605, 632, 640, 643 and 644.

Additionally petitioner claims that the FOIA documents provide evidence contradictory to Dr. Bloemendaal's testimony that Agent Williams was killed by a high velocity bullet, and raise a serious question as to Dr. Noguchi's similar testimony regarding Agent Coler's fatal wounds. However, the documents cited by petitioner merely summarize the statements made by Dr. Bloemendaal in his autopsy reports. The autopsy report on Agent Coler does not characterize the velocity of the gunshots. Trial Exhibit 7 at 3, Autopsy of Jack R. Coler performed by Dr. R.D. Bloemendaal (June 27, 1975). The autopsy report of Agent Williams clearly states that the gunshot wound to Agent Williams' head "appeared to be a high velocity missile." Trial Exhibit 7 at 7, Autopsy of Ronald Williams. Therefore, although the teletypes themselves may have been newly discovered, that is discovered since trial, the information contained within them clearly was not. As a result, these documents add nothing new to the evidence presented at trial and considered in the context of the entire record, do not create a reasonable doubt as to Peltier's guilt that did not otherwise exist.

Finally, it is clear that the newly discovered ballistics test teletype is merely cumulative of the evidence produced at trial. At trial, an October 1975 FBI laboratory report stating that the .223 casing found in the trunk of Agent Coler's car could not be associated with any of the weapons submitted to the laboratory for a comparison was placed in evidence. Trial Exhibit 135. However, a February 1976 report stating that the .223 casing had been associated with the Wichita AR–15 was also placed in evidence. Trial Exhibit 192. Agent Hodge

testified that he first began to examine the .223 casing in December 1975 or January 1976, thus explaining the discrepancy between the two reports. Trial Transcript at 3388. Evidence of two ballistics tests performed on different dates and the examiner's reasons for the difference in the results was thereby presented to the jury.

Additionally, Agent Hodge testified that the extractor mark comparison test performed "positively identifies Government's Exhibit 34B [the .223 casing] as having been loaded into and extracted from Government Exhibit 34A [the AR–15]," Trial Transcript at 3247, and that an extractor mark comparison "does not necessarily mean that the cartridge case has been fired in that gun because the markings can be placed on the cartridge case without actually firing the cartridge case." *Id.* at 3248. Presentation of an additional teletype reporting negative test results prior to the testing of the .223 casing, no matter which ballistics test was performed, would be merely cumulative and, in light of Agent Hodge's trial testimony relating to whether or not the .223 casing had been fired from the AR–15, would not create a reasonable doubt as to petitioner's guilt that did not otherwise exist.

■ Because the alleged nondisclosures, evaluated in the context of the entire record, do not create a reasonable doubt as to petitioner's guilt that did not otherwise exist, no constitutional error, or even probability of constitutional error, has been established. Assuming the documents referred to in defendant's petition were known by the prosecutor but not known by defense counsel at time of trial, the prosecutor had no duty to disclose them to defense counsel, and the alleged nondisclosures do not amount to suppression. Petitioner having failed to meet the requirements of *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), reiterated in *Agurs* at 109, 96 S.Ct. at 2400, no *Brady* violations have been established; petition-

er's right to due process of law has not been violated and petitioner is not entitled to post-conviction relief.

■ Additionally, petitioner has failed to prove violations of his sixth amendment rights of confrontation and compulsory process. None of the alleged newly discovered evidence demonstrates a corruption of the truth seeking process by the government. The same claim or much of the same evidence was considered and rejected by the Court of Appeals in its opinion affirming Peltier's conviction, *United States v. Peltier,* 585 F.2d at 330–334, and as such cannot be considered as a basis for § 2255 relief. *Houser v. United States,* 508 F.2d at 514.

■ As a general rule a hearing is afforded prior to the disposition of § 2255 motions presenting factual issues. *Lindhorst v. United States,* 585 F.2d 361, 364 (8th Cir.1978) quoting *Cain v. United States,* 271 F.2d 337, 338 (8th Cir.1959). However, no factual issues have been presented to the court by defendant's petition which cannot be resolved by the record in the case. Further, the hearing requirement is subject to the statutory qualification that a hearing need not be held when "the motion and the files and records of the case [2] conclusively show that the prisoner is entitled to no relief ...." 28 U.S.C. § 2255.

It is the opinion of this court that the motion, files and records of this case conclusively show petitioner is entitled to no relief. Petitioner's request for an evidentiary hearing is denied.

IT IS ORDERED petitioner's motion to vacate judgment and for a new trial is denied.

---

2. Affidavits submitted by the government are not a part of the files and records of the case which can be taken to conclusively show that the prisoner is entitled to no relief within the

meaning of 28 U.S.C. § 2255. *Lindhorst v. United States,* 585 F.2d at 365, quoting *Taylor v. United States,* 487 F.2d 307, 308 (2nd Cir. 1973).